UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

_____

PAUL   M.,[1]

                              Plaintiff                    DECISION AND ORDER

-vs-

                                                     19-CV-6822 CJS

COMMISSIONER OF SOCIAL
SECURITY,

                              Defendant.

_____

INTRODUCTION

This is an action brought pursuant to 42 U.S.C. § 405(g) to review the final determination of the Commissioner of Social Security ("Commissioner" or "Defendant") which denied the application of Plaintiff for Social Security Disability Insurance ("SSDI") benefits.   Now before the Court is Plaintiff's motion (ECF No. 8) for judgment on the pleadings and Defendant's cross-motion (ECF No. 10) for the same relief.   For the reasons discussed below, Plaintiff's application is granted, Defendant's application is denied, and this matter is remanded to the Commissioner for further administrative proceedings.

STANDARDS OF LAW

The Commissioner decides applications for SSI benefits using a five-step sequential evaluation:

---

[1] The Court's Standing Order issued on November 18, 2020, indicates in pertinent part that, "[e]ffective immediately, in opinions filed pursuant to Section 205(g) of the Social Security Act, 42 U.S.C. § 405(g), in the United States District Court for the Western District of New York, any non-government party will be identified and referenced solely by first name and last initial."

1

> A five-step sequential analysis is used to evaluate disability claims. *See* 20 C.F.R. §§ 404.1520, 416.920.   First, the Commissioner considers whether the claimant is currently engaged in substantial gainful activity. If he is not, the Commissioner next considers whether the claimant has a severe impairment which significantly limits his physical or mental ability to do basic work activities. If the claimant suffers such an impairment, the third inquiry is whether, based solely on medical evidence, the claimant has an impairment which is listed in the regulations [or medically equals a listed impairment].   Assuming the claimant does not have a listed impairment, the fourth inquiry is whether, despite the claimant's severe impairment, he has the residual functional capacity [("RFC")] to perform his past work.[2]  Finally, if the claimant is unable to perform his past work, the Commissioner then determines whether there is other work which the claimant could perform.   The claimant bears the burden of proof as to the first four steps, while the Commissioner bears the burden at step five.

*Colvin v. Berryhill*, 734 F. App'x 756, 758 (2d Cir. 2018) (citations and internal quotation marks omitted)

An unsuccessful claimant may bring an action in federal district court to challenge the Commissioner's denial of the disability claim.   In such an action, "[t]he court shall have power to enter, upon the pleadings and transcript of the record, a judgment affirming, modifying, or reversing the decision of the Commissioner of Social Security, with or without remanding the cause for a rehearing." 42 U.S.C.A. § 405(g) (West).   Further, Section 405(g) states, in relevant part, that "[t]he findings of the Commissioner of Social security as to any fact, if supported by substantial evidence, shall be conclusive."

---

[2] Residual functional capacity "is what the claimant can still do despite the limitations imposed by his impairment." *Bushey v. Berryhill*, 739 F. App'x 668, 670–71 (2d Cir. 2018) (citations omitted); *see also*, 1996 WL 374184, Titles II & Xvi: Assessing Residual Functional Capacity in Initial Claims, SSR 96-8P (S.S.A. July 2, 1996).

2

The issue to be determined by the court is whether the Commissioner's conclusions "are supported by substantial evidence in the record as a whole or are based on an erroneous legal standard." *Schaal v. Apfel*, 134 F.3d 496, 501 (2d Cir. 1998); *see also, Barnaby v. Berryhill*, 773 F. App'x 642, 643 (2d Cir. 2019) ("[We] will uphold the decision if it is supported by substantial evidence and the correct legal standards were applied.") (citing *Zabala v. Astrue*, 595 F.3d 402, 408 (2d Cir. 2010) and *Talavera v. Astrue*, 697 F.3d 145, 151 (2d Cir. 2012).").

"First, the [c]ourt reviews the Commissioner's decision to determine whether the Commissioner applied the correct legal standard." *Tejada v. Apfel*, 167 F.3d 770, 773 (2d Cir. 1999); *see also, Pollard v. Halter*, 377 F.3d 183, 189 (2d Cir. 2004) ("[W]here an error of law has been made that might have affected the disposition of the case, this court cannot fulfill its statutory and constitutional duty to review the decision of the administrative agency by simply deferring to the factual findings of the [administrative law judge] [("]ALJ["]). Failure to apply the correct legal standards is grounds for reversal.") (citation omitted).

If the Commissioner applied the correct legal standards, the court next "examines the record to determine if the Commissioner's conclusions are supported by substantial evidence." *Tejada v. Apfel*, 167 F.3d at 773.   Substantial evidence is defined as "more than a mere scintilla.   It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Id*. (citation omitted).

> The substantial evidence standard is a very deferential standard of review—even more so than the 'clearly erroneous' standard, and the Commissioner's findings of fact must be upheld unless a reasonable

3

factfinder would have to conclude otherwise." *Brault v. Social Sec. Admin., Comm'r*, 683 F.3d 443, 448 (2d Cir. 2012) (per curiam) (emphasis in original). "An ALJ is not required to discuss every piece of evidence submitted, and the failure to cite specific evidence does not indicate that such evidence was not considered." *Id*.

*Banyai v. Berryhill*, 767 F. App'x 176, 177 (2d Cir. 2019), as amended (Apr. 30, 2019) (internal quotation marks omitted).

In applying this standard, a court is not permitted to re-weigh the evidence. *See, Krull v. Colvin*, 669 F. App'x 31, 32 (2d Cir. 2016) ("Krull's disagreement is with the ALJ's weighing of the evidence, but the deferential standard of review prevents us from reweighing it."); *see also, Riordan v. Barnhart*, No. 06 CIV 4773 AKH, 2007 WL 1406649, at *4 (S.D.N.Y. May 8, 2007) ("The court does not engage in a *de novo* determination of whether or not the claimant is disabled, but instead determines whether correct legal standards were applied and whether substantial evidence supports the decision of the Commissioner.") (citations omitted).

## FACTUAL and PROCEDURAL BACKGROUND

The reader is presumed to be familiar with the facts and procedural history of this action. The Court will refer to the record only as necessary to address the errors alleged by Plaintiff.

Plaintiff's medical history includes pain in the lumbo-sacral spine with sciatica secondary to degenerative disc disease, history of coronary artery disease with successful bypass surgery, high cholesterol, tobacco abuse, history of alcohol abuse with resulting pancreatitis, history of brain lesion/meningioma, anxiety and depression.

4

Plaintiff also has a significant history of dependency on prescription opiates and benzodiazepines, which he claims are needed to address his severe back pain and/or to prevent anxiety. Tr. 275, 281, 313, 327, 346, 352-353. 384, 418, 526, 530-532. Plaintiff's manipulative drug-seeking behavior (through dishonesty, at times) is referenced throughout his treatment records. *See, e.g.*, Tr. 384, 556 (tried to get medications in other places, while simultaneously trying to get them from primary doctor without telling him).   Plaintiff has resisted his primary care doctor's suggestions that he reduce his use of such medications, and treatment providers have been hesitant to force the issue out of concern that Plaintiff's anxiety will increase. Tr. 327, 574 ("Patient is always in crisis so have not started tapering.").   On one occasion, Plaintiff angrily threw a pitcher of water at a nurse because she was not getting him the medications he wanted. Tr. 530.   On other occasions Plaintiff has threatened suicide, or made a suicidal gesture, to obtain narcotics and benzodiazepines. *See, e.g.*, Tr. 525-526, 537, 553 ("Patient goes to great lengths to get opiates and benzodiazepines when he runs out of his prescriptions.").   Otherwise, when Plaintiff has the medications that he wants, he has routinely denied any intention to actually commit suicide. *See, e.g.*, Tr. 486. Plaintiff has been content to rely on his medications, and has rejected suggestions by his doctors to quit smoking, lose weight, exercise and attend physical therapy and psychotherapy.

Treatment providers have noted that Plaintiff's depression is largely secondary to the downward spiral that his life circumstances took after his real estate business failed and he encountered severe financial reversals. *See, e.g.*, Tr. 353 ("depression,

5

uncontrolled due to life events."). In that regard, Plaintiff has commented that he went from making $80,000 per year to living in a homeless shelter. Although, Plaintiff reportedly had some degree of depression and anxiety even before his finances collapsed. Tr. 551 ("Patient has had a history of depression in the past but started to get more depressed in 2008 when the real estate business started to get into trouble[.]").

Between 2014 and 2015, Plaintiff was jailed for seven months related to charges of arson and criminal mischief, after he started a fire in his apartment. A report by Emergency Medical Services ("EMS") on the night of the fire indicates that Plaintiff started the fire intentionally out of anger, after another tenant sprayed water on him. Tr. 436-439, 509, 643.[3] However, Plaintiff has repeatedly told other treatment providers that the fire was accidental and that he is unsure how it started.

Before this incident landed him in jail, Plaintiff had his belongings packed in boxes and was planning an imminent move to State College, Pennsylvania, to return to college and study music. Tr. 689. In that regard, Plaintiff stated that he had "incredible music talent," and there are other references in the record to him being a bass guitar player. Tr. 689.

While in jail, Plaintiff indicated that he was enraged and depressed because his family would not post his $250 bail. Tr. 632. Plaintiff stated that he intended to live

---

[3] On March 29, 2016, Plaintiff told an evaluating psychiatrist that he was unsure how the fire had started, and that he had been awakened by the smell of smoke, Tr. 418, 551, but notes from the Emergency Medical Services personnel who responded to the fire indicated that Plaintiff admitted starting the fire in anger, and that he had snuck out of his apartment after firefighters arrived and then gotten into his car, where he feigned unconsciousness. Tr. 436. Plaintiff was lethargic and had pinpoint pupils, suggestive of drug use. Tr. 496. In jail, Plaintiff indicated to his therapist that his being in jail resulted from him "losing his head with a neighbor." Tr. 643.

independently and return to work once he was released. Tr. 632 ("I am just going to sit here until my trial is over and go out there and do my thing. Make some money and forget about them."). Plaintiff further told his jail counselor that he was interested in returning to college. Tr. 632 ("He is feeling hopeless and helpless, but not suicidal. He has future orientation about getting out of jail and going to college.").[4] Plaintiff also acknowledged his dependence on valium and expressed the desire to be weaned off the drug, though this did not happen. Tr. 632 ("I want more medications. More antidepressants. Please take me off the valium very slowly and hit me hard with Librium, it is going to be a rough ride."). In that regard, a jail doctor expressed concern about taking Plaintiff off valium, since Plaintiff had been on the drug so long, and since the doctor feared it would cause Plaintiff's anxiety to increase. Tr. 678 ("[Inmate] has chronic anxiety and panic disorder. He has been on valium for years [and] has very poor coping skills. His anxiety is better controlled on this medication [and] he might decompensate further if I [discontinue it.]"). The doctor noted, though, that the plan was to eventually get Plaintiff off valium. Tr. 678 ("Working on taking him off but he might not do well on Librium due to depression."). Jail psychiatric staff reported that Plaintiff was "very medication seeking and ha[d] very poor coping skills." Tr. 637.

While in jail, Plaintiff was depressed and angry about his circumstances, which initially caused jail staff to place him on suicide observation, but later his mental status was otherwise judged to be normal. Tr. 629-631, 635. However, Plaintiff argued to jail staff that his regular medications should be increased, since he had much more stress

---

[4] Plaintiff already has an undergraduate degree.

7

from being incarcerated. Tr. 657, 665.   Plaintiff also requested additional pain medication after he reportedly hurt his lower back after slipping in the jail shower. Plaintiff, though, indicated that he exercised in the jail's gym and was able to walk over a mile at one time. Tr. 63.   Plaintiff also asked jail staff to contact his attorney to check on the status of his SSDI application. Tr. 646.

After Plaintiff was released from jail, he had no job, no property and no family support, with the lack of family support being reportedly due to family members' perception of him as a drug abuser.[5] Tr. 328, 645.   Consequently, Plaintiff lived first in a homeless shelter and then in a rooming house.   Plaintiff later obtained some sales jobs for brief periods, but he either quit them or was fired.[6]

On August 26, 2016, Plaintiff's long-time primary care doctor, Douglas Stockman, M.D. ("Stockman"), completed a functional capacity assessment (Tr. 702-703) indicating that Plaintiff had lumbo-sacral-disc dessication and meningioma; that his condition was stable but would not improve; that he was not experiencing headaches presently; that his back pain was usually 5/10 but would increase to 9/10 when bending, twisting, turning or lifting; that his pain would "constantly" interfere with his attention and concentration needed to do even simple tasks; that he could rarely lift 20 pounds and occasionally lift 10 pounds; that he was unable to walk even a single block, since he could only walk slowly and needed to stop after 5 minutes; that he could sit, stand and

---

[5] Plaintiff has reported feeling betrayed and abandoned by most of the people in his life. Tr. 534 ("They are all a bunch of spiteful liars.").
[6] On March 29, 2016, Plaintiff told an evaluator that he had had six jobs since being released from jail. Tr. 32.

8

walk all for less than 2 hours in an 8-hour workday; that he needed to change position frequently; that he could sit for 45 minutes at a time and stand for 10 minutes at a time; that pain significantly impaired his daily functioning; that his conditions would result in him missing more than 4 days of work per month; and that he had "significant depression and anxiety." Tr. 702-703.

On August 29, 2016, Barbara Gawinski, Ph.D., LMPA ("Gawinski") completed a Mental Impairment Questionnaire. (Tr. 704-706).   Gawinski stated that Plaintiff had treated with her between January 2016 and July 2016, and had attended 17 appointments before stopping treatment. Tr. 704.   Treatment notes indicate that at his last visit with Gawinski, Plaintiff became angry with her about a political issue and then declined to schedule any further appointments.   Gawinski's axis I diagnoses were major depressive disorder, single episode (296.22) and anxiety disorder not otherwise specified (300.00).   Regarding the course of treatment, Gawinski stated that Plaintiff's mood had improved, with increased optimism and decreased irritability, but that he had become angry, irritable, critical and hostile at their last visit. Tr. 704. Gawinski reported the following signs and symptoms supporting her diagnoses: Anhedonia, intense and unstable interpersonal relationships, thoughts of suicide, mood disturbance, emotional lability, deeply ingrained maladaptive patterns of behavior, inflated self-esteem and intrusive thoughts and persistent disturbances of mood. Tr. 704-705.   Gawinski stated that Plaintiff had marked restriction in activities of daily living, marked difficulties in maintaining social functioning and moderate deficiencies in maintaining attention, concentration or pace, and that he had had 3 episodes of decompensation lasting at

least 2 weeks during the preceding 12 months. Tr. 705.   Gawinski reported that Plaintiff was unable to function outside of a highly supportive living arrangement and that he was completely unable to function independently outside of his home. Tr. 706. Finally, Gawinski noted that Plaintiff had demonstrated an inability to get and maintain a steady job. Tr. 706.

Some time after August 2013, psychologist Mary C. Grant, Ph.D. ("Grant") wrote an undated summary of her treatment with Plaintiff. Tr. 707-708.   Granted stated that Plaintiff had treated with her off-and-on "for brief periods over the years."   Grant stated that in 2013 Plaintiff had been diagnosed with major depressive disorder, recurrent, severe, without psychotic features, and personality disorder not otherwise specified with borderline and narcissistic traits. Tr. 707.   Grant indicated that she had last seen Plaintiff for four office visits in 2013, at which time his depression and anxiety had worsened since the prior year, and that his judgment and insight were quite limited, and his "discomfort level had increased." Tr. 707.   Grant's statement did not purport to evaluate any particular functional limitations, but noted that Plaintiff had been offered a job by his cousin. Tr. 707 (Elsewhere, the record indicates that Plaintiff was later fired from that job).

On October 2, 2014, Grant wrote a more-detailed disability assessment. Tr. 311-317.   Granted stated that the expected duration of Plaintiff's condition was "indefinite"; that he had also been treated for alcoholism and Xanax addiction; that after his realty business failed he "began to function less well and was overwhelmed at times with anxiety and depression"; that when last seen his attitude was "negative, desperate,

10

looking for someone to support him until he got on his feet"; that his thoughts were unrealistic, with poor judgment and planning ability; and that he appeared depressed, tired, sad, and angry that he was "not getting a positive response from people." Tr. 312-313.   Grant estimated that Plaintiff's judgment and insight were "impaired" but that he had normal attention and concentration, orientation, memory, information, and ability to perform calculations. Tr. 314.   Grant reported that Plaintiff had suicidal ideation but no plan. Tr. 315. Grant stated that Plaintiff seemed able to perform his activities of daily living, but that he felt too anxious and depressed to work. Tr. 315.   Grant stated that Plaintiff had "limited" abilities with regard to maintaining sustained concentration and persistence, interacting socially and adapting.   Granted, noted, for example, that Plaintiff "had problems with others," felt entitled to express his thoughts without repercussions, did not deal with change and did not set realistic goals. Tr. 316.   Grant stated that she had suggested to Plaintiff that he try to get a simple job to avoid homelessness, and that she had given him strategies for dealing with depression. Tr. 315.   However, Grant indicated that Plaintiff presently lacked the mental ability to work because he was "obsessed with his problems." Tr. 315.

On March 29, 2016, Plaintiff was evaluated by treating psychiatrist Michael Privitera, M.D. ("Privitera"), who reported that Plaintiff's mood was "anxious and depressed," but that his examination was otherwise normal in most respects, and that he had above-average intelligence. Tr. 553.   Privitera's diagnosis was "major depression, recurrent with melancholia.   Rule out generalized anxiety disorder. Personality characteristics play a role that seem amplified by depression." Tr. 553.

11

Plaintiff asked Privitera for a valium prescription, claiming that his prescription was due to be refilled the next day, and Privitera commented that it "would be good to try to eventually wean this down somewhat but seems like [the valium is] necessary until we can push up his BusPar dose." Tr. 553.

At the time of the administrative hearing, Plaintiff was 50 years of age and had earned a bachelor's degree.   Plaintiff's work history primarily involved sales, particularly as a realtor. Plaintiff had last worked earlier that year, for about six weeks as a car salesman, but he had quit that job because it had required him to stand outside in the cold and compete with other salesmen for customers. Tr. 48-49.   Plaintiff told the ALJ that he had been treating with Dr. Gawinski, and that she and he had agreed to take a break and would resume treatment shortly. Tr. 51, 59.   However, as discussed earlier, that is not what Gawinski's notes indicate.   Plaintiff stated that he could walk between a quarter mile and a half mile, and stand for a half hour. Tr. 54.   Plaintiff acknowledged that he had declined to pursue vocational training that his therapist had recommended. Tr. 55.   For daily activities, Plaintiff stated that he went on his laptop, wrote in a journal, performed household chores, went to church, drove to appointments, and listened to music or talk radio. Tr. 48, 56-57, 61.   Plaintiff testified that he did not have problems interacting with people, but that he was not interested in seeing people that he knew since he was embarrassed that his life was currently a "train wreck." Tr. 61.

On September 26, 2016, an ALJ issued a decision finding that Plaintiff was not disabled at any time between the alleged disability onset date (June 1, 2013) and the date of the decision.   Applying the sequential evaluation discussed earlier the ALJ

found, at steps one, two and three, respectively, that Plaintiff was not engaged in substantial gainful activity; that he had severe impairments (coronary artery disease, degenerative disc disease, mood disorder with personality component, anxiety disorder and history of polysubstance abuse in remission) and a non-severe impairment (meningioma); and that none of the impairments, either singly or in combination, met or medically equaled a listed impairment. Prior to reaching step four of the sequential evaluation, the ALJ essentially found that Plaintiff had the RFC to perform medium work with various postural and environmental limitations, and with only brief and superficial contact with co-workers, supervisors and the public. Tr. 28. At step four, the ALJ found that Plaintiff could not perform any past relevant work, but at step five the ALJ found, based on testimony from a vocational expert ("VE") in response to hypothetical questions, that Plaintiff could perform other jobs and was therefore not disabled.

In reaching these conclusions the ALJ discussed and evaluated the treatment records and medical opinions quite extensively. Tr. 26-37. In finding that Plaintiff did not meet a listed mental impairment, the ALJ noted Gawinski's opinion but assigned it "little to no weight," stating that, "While the claimant does have some mental limitations, his allegations [sic] are not to the extent alleged." Tr. 27. The ALJ then reviewed various evidence in the record that she maintained showed that Plaintiff had only mild restriction in activities of daily living, moderate difficulty in social functioning, mild difficulty in maintaining concentration, persistence or pace, and no extended periods of decompensation. Tr. 27-28. The ALJ did not cite any medical opinion that was contrary to Gawinski's conclusions, nor did she mention Dr. Grant's opinions.

In connection with her RFC finding, the ALJ reviewed the evidence and, with regard to mental impairments, noted Plaintiff's intermittent treatment history and drug-seeking behaviors, including using apparently insincere claims of suicidal ideation to obtain medications. Tr. 34.   The ALJ also noted Plaintiff's decision in 2015 not to seek additional treatment after he learned that such treatment would first need to focus on alcohol dependence. Tr. 34.   The ALJ further discussed Plaintiff's stated activities of daily living (when not working) and found them to be "rather normal, though he reports problems." Tr. 34.   The ALJ stated, in pertinent part:

> Overall, it does not appear that a mental (or physical) impairment prevented the claimant from being more active, should he wish to be. The claimant worked when he had an opportunity, to his credit.   However, remaining unemployed because of a claimant's inability to get work or hiring practices of employers are not factors in deciding whether a claimant is disabled.   Finances appear to be a large impetus in this case. The claimant was 'unemployed' as opposed to disabled.   The claimant appears to be [a] rather astute individual of above-average intelligence. Though he has only attempted skilled work, other work exists.   Though the claimant has severe impairments, no evidence indicates work-precluding limitations for a finding of disabled under the Social Security Act.

Tr. 34 (citations to record omitted).   The Appeals Council declined to review the ALJ's decision, making it the Commissioner's final decision.

In this action, Plaintiff asserts primarily that the RFC finding was erroneous since the ALJ failed to properly apply the treating physician rule to the opinions of Drs. Grant and Gawinski.   On this point, Plaintiff states: "First, it was an abuse of discretion by the ALJ to not weigh, summarize, or evaluate the opinion of Dr. Grant from October 2, 2014."   Plaintiff argues that this error was compounded by the fact that the ALJ

14

considered Dr. Grant's other, less detailed statement, and gave it little weight, purportedly since it lacked the very information that was contained in the report she did not consider.   Plaintiff further contends that the ALJ did not provide sufficiently good reasons for the weight that was given to Dr. Gawinski's opinion, and selectively "cherry picked" information from the treatment notes.   Further, Plaintiff alleges that the ALJ arbitrarily substituted her own opinion for that of competent medical opinion which was not contradicted by any other medical opinion.   Plaintiff argues that he has listed impairments and that remand solely for calculation of benefits is required, since there is no contrary evidence.[7]

Defendant disputes Plaintiff's arguments and maintains that the ALJ's decision is free of reversible legal error and supported by substantial evidence

The Court has carefully reviewed and considered the parties' submissions and finds, for the reasons discussed below, that the matter must be remanded to the Commissioner for further administrative proceedings.

## DISCUSSION

Plaintiff primarily contends that the ALJ erred in failing to consider Dr. Grant's opinion dated October 2, 2014.   The Court agrees.

Of course, as noted above, an ALJ is not required to discuss every piece of evidence submitted, and the failure to cite specific evidence does not indicate that such

---

[7] Pl's. Mem. of Law at p. 25 ("[T]wo separate treating psychologists and extensive clinical findings within the mental status examinations constitute substantial evidence meeting the requirements of both Listings 12.04 and 12.06, and Plaintiff's motion should be granted with reversal and remand to the Commissioner solely for the calculation of benefits.").

evidence was not considered.   Here, however, there is a further indication that the ALJ did not consider the subject opinion.    In this regard, there were two different opinions from Dr. Grant.   The first, Exhibit 3F, was a standard, detailed, multi-page RFC assessment form, while the second, Exhibit 18F, was a brief letter without any particular functional assessments. Tr. 311, 707.   The ALJ referenced Exhibit 18F twice, but gave it only "limited weight" purportedly because it lacked specific functional limitations, was based on Plaintiff's self-reported symptoms and was not supported by Plaintiff's "conservative mental health treatment." Tr. 36.   Meanwhile, the ALJ did not discuss or cite Exhibit 3F at all, which is significant since that exhibit, which opines that Plaintiff is far more limited than what the ALJ found, sets forth specific functional limitations and details the supporting findings upon which it was based.   Consequently, there seems to be only two possibilities: Either the ALJ failed to consider Grant's more-detailed opinion, Exhibit 3F, or she impermissibly "cherry-picked" by only discussing evidence from Grant that could easily be rejected, while ignoring Grant's more detailed statement.   The Court assumes that the ALJ did the former and not the latter.

Defendant does not really address Plaintiff's argument on this point.   That is, Defendant does not try to argue that the ALJ actually considered Exhibit 3F.   Nor does Plaintiff argue that the error was harmless due to the exhibit being redundant or otherwise insignificant.   Instead, Defendant discusses the contents of Exhibit 3F, which the ALJ did not do, and offers arguments about the purported inadequacies of the exhibit. Def. Memo of Law at pp. 7-8, 20-21, 24, 29.   In effect, Defendant now tries to perform the analysis of Exhibit 3F that the ALJ was required to perform.   However, "[a]

reviewing court may not accept appellate counsel's *post hoc* rationalizations for agency action." *Snell v. Apfel*, 177 F.3d 128, 134 (2d Cir. 1999) (citation and internal quotation marks omitted).

Remand is appropriate where it is shown that an ALJ failed to consider relevant and probative evidence. *Lopez v. Sec'y of Dep't of Health & Hum. Servs.*, 728 F.2d 148, 150–51 (2d Cir. 1984) ("We have remanded cases when it appears that the ALJ has failed to consider relevant and probative evidence which is available to him."). The Court concludes that the ALJ erred in that regard and that remand is therefore required for consideration of the overlooked evidence.[8]

The Court notes one further problem with the ALJ's decision, which is the assertion, quoted earlier, as follows:

> [R]emaining unemployed because of a claimant's inability to get work or hiring practices of employers are not factors in deciding whether a claimant is disabled. Finances appear to be a large impetus in this case. The claimant was 'unemployed' as opposed to disabled.

Tr. 34. Insofar as this statement implies that the reason Plaintiff was unemployed was because of the "inability to get work" or "the hiring practices of employers," it is inaccurate since it ignores the fact that Plaintiff managed to "get" many jobs during the relevant period but was unable to keep any of them for very long. There is little if any discussion or exploration by the ALJ of the particular circumstances that led to Plaintiff

---

[8] The Court disagrees with Plaintiff's assertion that remand solely for calculation of benefits is required. Despite the ALJ's error with regard to Dr. Grant's opinion, the record is not so clearly one-sided as to warrant a remand solely for that purpose.

losing most of those jobs, or of how, if at all, those circumstances were related to Plaintiff's alleged mental impairments. Consequently, the ALJ's conclusion that Plaintiff was unemployed as opposed to disabled needs to be better explained.

## CONCLUSION

For the reasons discussed above, Plaintiff's motion (ECF No. 8) for judgment on the pleadings is granted, Defendant's cross-motion (ECF No. 10) for the same relief is denied, and this matter is remanded to the Commissioner pursuant to sentence four of 42 U.S.C. § 405(g) for further administrative proceedings consistent with this Decision and Order.

So Ordered.

Dated: Rochester, New York
        March 31, 2021

ENTER:

/s/ Charles J. Siragusa
CHARLES J. SIRAGUSA
United States District Judge